# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **WILLIE LAKES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 11 C 3592** |
| | ) | |
| **v.** | ) | |
| | ) | **Magistrate Judge Maria Valdez** |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

This is an action brought under 42 U.S.C. § 405(g) to review the final decision of the Commissioner of Social Security denying plaintiff Willie Lakes's claim for Social Security Disability and Supplemental Security Income Benefits. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons that follow, Lakes's motion for summary judgment [Doc. No. 14] is granted in part and denied in part. The Court finds that this matter should be remanded to the Commissioner for further proceedings.

## BACKGROUND

### I.    PROCEDURAL HISTORY

Lakes originally applied for Social Security Disability and Supplemental Security Income benefits on April 10, 2003, alleging disability due to depression and pain since May 3, 2002. (R. 207-09.) The application was denied on June 18, 2003 and upon reconsideration on November 10, 2003. (R. 164-75.) Lakes filed a timely

request for a hearing by an Administrative Law Judge ("ALJ"), which was held on November 30, 2005. (R. 177, 132-63.) Lakes personally appeared and testified at the hearing and was represented by counsel. (R. 135.) A vocational expert also testified at the hearing. (*Id.*)

On March 31, 2005, the ALJ denied Lakes's claim for benefits and found him not disabled under the Social Security Act. (R. 132-63.) After Lakes requested review of the ALJ's decision, the Social Security Administration Appeals Council remanded his claim to give further consideration to the claimant's maximum Residual Functional Capacity ("RFC") on a function-by-function basis; obtain evidence from a medical expert to clarify the nature and severity of his impairments; and obtain supplemental evidence from a vocational expert, if warranted by the expanded record. (R. 126-28.) A second hearing before the same ALJ occurred on December 2, 2008, and the ALJ again found Lakes not disabled. (R. 35-82, 1402-83.) The Appeals Council denied Lakes's request for review of the second decision on July 22, 2011, (R. 10-14), leaving the ALJ's decision as the final decision of the Commissioner and therefore reviewable by the District Court under 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

## II.    FACTUAL BACKGROUND

### A.    Testimony and Medical Evidence

#### 1.    *Lakes's Testimony*

At the time of the second ALJ hearing, Lakes had recently turned fifty years old. (R.1414.) He had been divorced for three or four years and had one biological

child. (R. 1412.) He completed school through the ninth grade; he began the tenth grade but did not finish and did not obtain a GED. (R. 1414.) In the past, Lakes had been employed as a forklift driver, a machine operator, heavy equipment operator, warehouse worker, school bus driver, and a day laborer. (R. 1417-22.) Lakes had received worker's compensation for a period of time following an on-the-job accident, and at the time of the hearing, he was on public aid. (R. 1413-14.)

Plaintiff stated that he can read and write some, but not well. (R. 1414-15.) He claimed to suffer from anxiety and depression, as well as headaches and pain in his back, shoulders, and neck. (R. 1427, 1449-51.) He stated that his ability to read is negatively affected by the anxiety and depression, which make him unable to concentrate and focus. (R. 1415.) He was hospitalized in 2004 for a suicide attempt but had not been admitted since that time. (R. 1427.)

Lakes testified that he cannot sit or stand for long periods of time, and he cannot bend over, reach, or push or pull anything. (R. 1426.) He cannot lift his left arm above his head, and the most he can lift is approximately twelve pounds; he can stand in place three to five minutes at a time, walk one block without stopping and resting, and sit comfortably for about five or ten minutes. (R. 1439-40, 1447.) He stated that he has trouble putting on shirts by himself, and he cannot wash his back or feet without the assistance of his fiancee or sister. (R. 1441, 1447-48.)

Lakes claimed that he had once been an alcoholic and drug addict, but he had not used any alcohol or hard drugs in eight or nine years prior to the hearing. (R. 1442-43.)

Plaintiff does not usually sleep through the night, and he had been awake since 2:30 or 2:45 the morning of the hearing. (R. 1443.) When he cannot sleep, he will watch television, listen to the radio, or read the Bible or a magazine. (R. 1443, 1445.) He is usually in bed by 8:00 or 8:30 at night. (R. 1443.) He does not prepare his own meals; his fiancee, sister, or parents cook for him. (R. 1443-44.) He does no housework but sometimes exercises during the day. (R. 1444.) He can no longer engage in any hobbies such as bowling, golfing, and going to the movies, but he remains active in his church. (R. 1444-45.)

## 2. *Medical Evidence*

### a. __Treating Physician Reports__[1]

**Dr. Odeh**

Dr. Odeh, an internal medicine specialist, completed a state welfare form in July 2003 after examining Lakes twice, in April and July 2003. (R. 455-58.) He noted that Lakes had back and knee pain which caused moderate limitations in his ability to stand and sit, as well as marked limitations in his ability to walk, bend, stoop, turn, push, and pull. (R. 458.) Dr. Odeh also diagnosed Plaintiff with asthma, hypertension, and depression. (R. 455.)

In another state form completed on January 27, 2004, Dr. Odeh diagnosed him with schizophrenia, depression, asthma, hypertension, and back and knee pain. (R. 1124.) Dr. Odeh found that Lakes is significantly restricted in his ability to

---

[1] Lakes's medical history is voluminous. The Court has summarized only those reports that were considered by the parties and/or the ALJ to have particular significance.

walk, bend, stand, stoop, sit, turn, climb, push, or pull; and mildly restricted in gross and fine manipulations and dexterity. (R. 1127.) He can lift no more than twenty pounds, with frequent lifting of up to ten pounds. (*Id.*) He has marked limitations in his activities of daily living and concentration, persistence, and pace; and extreme limitations in social functioning. (*Id.*)

**Dr. Lee**

Dr. Lee, a psychiatrist, completed a welfare form on August 4, 2003, after his second visit with Lakes. (R. 576-77.) He concluded that Plaintiff had moderate functional limitations in daily and social function and the ability to sustain concentration, caused by depression and substance dependence. (R. 577.)

**Dr. Snyder**

On October 7, 2003, Ms. Nora Guini (who has a master's degree in psychology) performed a psychological evaluation of Lakes under the supervision of Dr. Snyder, a psychologist. (R. 517-22.) As part of the evaluation, Lakes was given the Wechsler Adult Intelligence Scale - III test and obtained a Verbal IQ of 81, Performance IQ of 70, and a Full Scale IQ of 74. (R. 520.) The evaluation noted that the scores placed Lakes within the Borderline range of intelligence and rank him at the fourth percentile. (*Id.*)

Based upon the results of evaluation, Ms. Guini and Dr. Snyder jointly submitted a Psychiatric Review Technique Form ("PRTF") and a mental RFC form. (R. 523-41.) The PRTF concluded that Lakes's impairments met Listing 12.04

(Affective Disorders) and equaled Listings 12.08 (Personality Disorders) and 12.09 (Substance Addition Disorders). (R. 523.)

In the RFC, Dr. Snyder found that Lakes had marked limitations in his ability to understand, remember, and carry out detailed or complex tasks or instructions; his ability to interact with co-workers or supervisors; and in his ability to sustain concentration and attention for complex tasks; and had moderate limitations in his ability to interact with the general public; to adapt to changes; or to sustain attention and concentration even for simple or repetitive tasks. (R. 535-36.)

### Dr. Doshi

Dr. Doshi was one of Lakes's treating psychiatrists at Loretto Hospital. He was the attending physician at the time Lakes was admitted to the hospital in January 2004 for severe depressive disorder with suicidal ideation. (R. 698-99.) Lakes was discharged in improved condition after several days, and he continued treatment with Dr. Doshi thereafter at Loretto's outpatient mental health clinic. (R. 699-708.) A November 25, 2005 note states that Lakes was being treated for "severe and incapacitating depression with marked anxiety." (R. 689.)

In a March 21, 2007 welfare form, Dr. Doshi opined that Lakes's mental impairments markedly limited his activities of daily living, social functioning, and concentration, persistence and pace. (R. 1005.) Dr. Doshi noted that Plaintiff had one episode of decompensation of extended duration during the preceding year. (*Id.*)

**Dr. Husain**

Dr. Husain, Lakes's primary care physician, began seeing him in February 2004. (R. 954, 923-38.) On November 5, 2005, Dr. Husain concluded that Lakes was "unable to do any work" as a result of his chronic physical and mental impairments. (R. 954.) In a November 25, 2008 impairment form, Dr. Husain opined that Plaintiff can sit, stand, and or walk for less than one hour per work day; sit for no longer than five minutes at a time; and needs five to ten minute breaks every five to ten minutes throughout the work day. (R. 1132-33.) Lakes can lift five to ten pounds occasionally and carry less than five pounds occasionally, and he has marked limitations in using either upper extremity. (R. 1133.) He could not push, pull, kneel, bend, or stoop, or work in environments that would expose him to moisture, fumes, gases, extremes of temperature, dust, or heights. (R. 1136.) Dr. Husain concluded that Plaintiff's symptoms would likely increase if he were placed in a competitive work environment and that he was incapable of even low-stress work activity. (R. 1134-35.)

A May 29, 2007 note from Dr. Husain opines that Lakes "is totally disabled without consideration of any past or present drug and/or alcohol use. Drug and/or alcohol use is not a material cause of this individual's disability." (R. 949.)

**Dr. Case**

Beginning in April 2004, Lakes began regularly seeing Dr. Case, a rheumatologist. (*See generally* R. 713-33, 738-56, 872-91.) Dr. Case diagnosed Lakes with fibromyalgia. (R. 756.) In October 2004, Dr. Case repeated the fibromyalgia

diagnosis but noted that Lakes was possibly malingering. (R. 750.) Dr. Case did not complete any welfare or RFC forms.

### Dr. Aniemeka

Dr. Aniemeka, a specialist in internal medicine, was asked to complete a welfare form at the time he first examined Lakes, May 17, 2005. (R. 1120-23.) He diagnosed Lakes with back pain, asthma, GERD, anxiety/depression, overactive bladder, and schizophrenia. (R. 1120.) He concluded that Lakes has marked limitations in every work related area of physical function with the exception of using his hands for fine or gross manipulation, which is only slightly limited; and Lakes can lift no more than ten pounds. (R. 1123.) Dr. Aniemeka also found that Lakes has marked or extreme mental limitations, with marked limitations in his ability to perform daily activities, extreme limitations in social function, four or more episodes of decompensation in the preceding year, and marked limitations in the ability to sustain concentration. (R. 70.)

After a November 28, 2005 visit by Lakes, Dr. Aniemeka completed another form supplied by Plaintiff's attorneys. (R. 690-97.) He noted that a June 2005 MRI showed degenerative disc changes and concluded that Lakes has marked limitations in his ability to sit, stand, and/or walk during the workday; can never lift more than five pounds; and is minimally limited in using his hands and arms. (R. 692-94.) He estimated Plaintiff's pain level as a nine out of ten. (R. 692.) Dr. Aniemeka estimated that Lakes would likely be absent from work more than three times per month due to his impairments. (R. 696.)

In a March 21, 2007 welfare form, Dr. Aniemeka concluded that Lakes can lift no more than ten pounds; has moderate limitations in the ability to walk, bend, stand, stoop, sit, turn, climb, push, pull, take public transportation, or perform daily activities; and is only slightly limited in the ability to use his hands. (R. 1000.) He did not discuss whether Plaintiff is limited by any mental impairments. (*Id.*) On May 31, 2007, Dr. Aniemeka certified that in his medical opinion, drug and/or alcohol use was not a material cause of Plaintiff's disability. (R. 959.)

### b.     DDS Consulting Physician Reports

A June 8, 2003 physical RFC report completed by DDS physicians concluded that Lakes can perform a wide range of work at the light exertional level. They opined that Lakes can lift, carry, push, and/or pull up to twenty pounds occasionally and up to ten pounds frequently; he can stand and/or walk for a total of two hours in a workday; he could sit throughout a normal workday; but he should not climb ladders, ropes or scaffolds, and should only occasionally balance, stoop, kneel, crouch, and/or crawl. (R. 447-54.) Lakes was found to have no manipulative, visual, communicative, or environmental limitations. (R. 450-51.)

A mental RFC was completed by DDS psychologists September 2003. (R. 476-79.) This RFC concluded that Lakes was only moderately limited in the ability to understand, remember, and carry out detailed instructions; the ability to interact appropriately with the general public; the ability to respond appropriately to changes in the work setting; and the ability to set realistic goals or make plans independently of others. (R. 476-77.) The reviewer noted that Lakes is angry and

9

frustrated with his plight, but his depression symptoms have diminished somewhat with treatment. (R. 478.) The same reviewer also noted that Plaintiff's depressive syndrome is characterized by psychomotor agitation or retardation, feelings of guilt or worthlessness, difficulty concentrating or thinking, and hallucinations, delusions, or paranoid thinking. (R. 483.) He was noted as having mild functional limitations in the activities of daily living; moderate difficulties in maintaining social functioning, concentration, persistence, or pace; and one or two episodes of decompensation, each of extended duration. (R. 490.)

### c.    <u>Medical Expert's Testimony</u>

Dr. William Newman, an orthopedic surgeon, testified at the second hearing as a medical expert. He described a number of medical reports and tests from Lakes's medical file and concluded that the medical evidence did not support a finding that any of his physical impairments met or equaled a Listing, alone or in combination. (R. 1456-58.) Dr. Newman opined that Lakes retained the RFC to perform light work, with a restriction on carrying significant weight above the shoulder level with his left (non-dominant) arm, and that the RFC was unchanged since his onset date of 2002. (R. 1459-60.) Dr. Newman testified that he did not agree with the more restrictive RFC opinions from Lakes's treating physicians because he did not believe they were based upon objective findings. (R. 1460.) He did agree with Plaintiff's attorney that fibromyalgia pain would not be objectively demonstrated by an x-ray or MRI. (R. 1463-64.)

### 3. *Vocational Expert's Testimony*

Edward Pagella testified at the second hearing as a vocational expert ("VE"). The ALJ asked the VE to identify occupations that could be performed by a hypothetical claimant, aged 43-50 years of age, with a tenth-grade education, past relevant work consistent with that of Plaintiff, with the RFC to perform the full range of light work with the following limitations: no climbing and working on unstable surfaces; no repetitive pushing or pulling with the non-dominant upper extremity; no extremes of respiratory irritants, unprotected heights, or unguarded hazardous equipment. (R. 1470-71.) The VE responded that the person would not be capable of performing his past relevant work or using any transferable skills, but he could perform a number of jobs at the light level of exertion, including assembler (5,800 positions in the Chicago metropolitan area), hand packer (3,600 positions), or hand sorter (1,800 positions). (R. 1471-73.) Including additional restrictions on climbing ramps or stairs, with only occasional stooping, crouching, or crawling did not change his answer. (R. 1472.) At the sedentary level, there would be 3,400 hand assembler positions; 2,200 hand packer positions; and 940 hand sorter positions available. (*Id.*) If the person were frequently distracted by pain, fatigue, or any other distraction, there would be no work available in the local economy. (R. 1474-75.)

While being questioned by Plaintiff's attorney, the VE stated that there would be no jobs available at the light or sedentary level if the person had the

additional restrictions of only occasional reaching with the non-dominant hand in all directions and shifting from sitting to standing throughout the day. (R. 1475-76.)

**B.    ALJ Decision**

The ALJ determined that Lakes met the insured status requirements of the Social Security Act through December 31, 2007 and at step 1, she found that Lakes had not engaged in disqualifying substantial gainful activity since his August 1, 2002 onset date. (R. 41.) At step 2, the ALJ found that Lakes suffered from severe impairments of back and shoulder pain, fibromyalgia, and depression and/or anxiety. (*Id.*) The ALJ found at step 3 that none of Plaintiff's physical or mental impairments, alone or in combination, met or medically equaled a Listing. (R. 42-47.) The ALJ concluded that Lakes retained the physical RFC to perform a wide range of light and sedentary work, subject to the following limitations: lifting, carrying, pushing and/or pulling up to twenty pounds occasionally and up to ten pounds frequently; never climbing ladders, ropes, or scaffolds or working on moving or unstable surfaces; and never working around unprotected heights; only occasionally climbing ramps or stairs, stooping, kneeling, crouching, or crawling; avoiding constant repetitive overhead reaching or lifting with the left arm; and avoiding exposure to extremes of temperature, humidity, or concentrated respiratory irritants. (R. 47.) At step 5, the ALJ found that there are significant numbers of jobs in the national economy that Lakes can perform, and thus he is not under a disability as defined in the Social Security Act. (R. 80-82.)

## III.   DISCUSSION

### A.   ALJ Legal Standard

Under the Social Security Act, a person is disabled if he has an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42. U.S.C. § 423(d)(1)(a).  In order to determine whether a claimant is disabled, the ALJ considers the following five questions in order:  (1) Is the claimant presently unemployed?  (2) Does the claimant have a severe impairment?  (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations?  (4) Is the claimant unable to perform his former occupation?  and (5) Is the claimant unable to perform any other work?  20 C.F.R. § 416.920(a)(4) (2008).

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled.  *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).  A negative answer at any step, other than at step 3, precludes a finding of disability.  *Id.*  The claimant bears the burden of proof at steps 1-4.  *Id.* Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the ability to engage in other work existing in significant numbers in the national economy.  *Id.*

**B.** **Judicial Review**

Section 405(g) provides in relevant part that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are support by substantial evidence or based upon legal error. *Clifford v. Apfel,* 227 F.3d. 863, 869 (7th Cir. 2000); *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). This Court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Skinner*, 478 F.3d at 841.

The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind her decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). In cases where the ALJ denies benefits to a claimant, "he must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. The ALJ "must at least minimally articulate the analysis for the evidence with enough detail and clarity to permit meaningful appellate review." *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Murphy v. Astrue*, 498 F.3d 630, 634 (7th Cir. 2007) ("An ALJ has a duty to fully develop the record before drawing any

conclusions, and must adequately articulate his analysis so that we can follow his reasoning.").

Where conflicting evidence would allow reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the court. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). However, an ALJ may not "select and discuss only that evidence that favors his ultimate conclusion," but must instead consider all relevant evidence. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).

### C. <u>Analysis</u>

Lakes argues that the ALJ erred by: (1) improperly evaluating his credibility; (2) failing to properly determine whether his impairment met Listings 12.05(C) and/or 12.04; and (3) discounting the opinions of his treating physicians with regard to the severity of his impairments.

#### 1. *<u>Credibility</u>*

An ALJ's credibility determination is granted substantial deference by a reviewing court unless it is "patently wrong" and not supported by the record. *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007); *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). However, an ALJ must give specific reasons for discrediting a claimant's testimony, and "[t]hose reasons must be supported by record evidence and must be 'sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.'" *Lopez* ex rel. *Lopez v. Barnhart*, 336 F.3d 535,

539-40 (7th Cir. 2003) (quoting *Zurawski*, 245 F.3d at 887-88). When assessing the credibility of an individual's statements about symptoms and their functional effects, an ALJ must consider all of the evidence in the case record. *See* SSR 96-7p.[2] "This includes . . . the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists . . . and any other relevant evidence in the case record." *Id.* at *1. In instances where the individual attends an administrative proceeding conducted by the adjudicator, the adjudicator may also consider his or her own observations of the individual as part of the overall evaluation of the credibility of the individual's statements. *Id.* at *5. Moreover, the absence of objective medical evidence supporting a claimant's subjective complaints is only one factor to be considered in the credibility determination. *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004). The ALJ must also consider: "(1) the claimant's daily activity; (2) the duration, frequency, and intensity of pain; (3) the precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions." *Id.*

The ALJ concluded that Lakes's testimony cannot be given credit because "the objective medical evidence establishes relatively minor anatomical

---

[2] Interpretive rules, such as Social Security Regulations ("SSR"), do not have force of law but are binding on all components of the Agency. 20 C.F.R. § 402.35(b)(1); *accord Lauer v. Apfel*, 169 F.3d 489, 492 (7th Cir. 1999).

abnormalities, out of proportion to claimant's complaints."[3] (R. 77.) The ALJ noted that despite his claims that he cannot use his upper body, Lakes has normal muscle tone and no significant muscle atrophy. (R. 78.)

She further commented that Plaintiff's descriptions of his physical and mental limitations have varied; the timing of his treatment visits often coincided with developments in his disability and/or worker compensation claims; his efforts to seek treatment increased significantly after the first unfavorable ALJ decision, including visiting with multiple providers, sometimes on the same day; doctors have noted that he is quite focused on receiving benefits; and Dr. Case had a concern that Lakes might be malingering. (R. 77-78.) The ALJ also mentioned that Plaintiff's testimony about his substance use, especially at the first hearing, was not credible. The ALJ acknowledged that Lakes may in fact be unable to remember making some of the reports involving treatment and evaluation, but he also admitted that sometimes he did not tell the truth in seeking treatment; according to the ALJ, that statement alone casts doubt on his credibility. (R. 77-78.)

As for his daily activities, the ALJ found his testimony at the first hearing incredible, where he stated that he was separated from his wife but needed her assistance to bathe on a daily basis. (R. 78.) The ALJ also found Lakes's explanations for why he left several of his places of employment not to be credible.

---

[3] The ALJ also described Lakes's credibility by repeating the boilerplate template that has been strongly criticized by the Seventh Circuit. *See Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012).

(*Id.*) Finally, the ALJ stated that Lakes's ability to reside in a family-owned building as well as his maintaining a long-term relationship with a fiancee "suggests that he functions better than he described to his doctors or at the second hearing." (*Id.*)

The Court finds that the ALJ's credibility determination was not sufficiently reasoned. First, the ALJ did not adequately explain why Lakes's increased efforts to seek treatment and obtain medical reports documenting his impairments after the first hearing is relevant to his credibility. The Appeals Council expressly remanded the claim after the first unfavorable decision to allow the ALJ to clarify the nature and severity of Plaintiff's impairments and to consider their effect on his RFC. Similarly, it is unclear how a focused, even "obsessive," desire to obtain benefits makes a claimant's disability claim more or less likely to be true.

Second, the ALJ did not fully discuss how Plaintiff's activities of daily living are inconsistent with a disability finding. As the Seventh Circuit has held:

> We have cautioned the Social Security Administration against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home. . . . The pressures, the nature of the work, flexibility in the use of time, and other aspects of the working environment as well, often differ dramatically between home and office or factory or other place of paid work.

*Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006); *see also Craft v. Astrue*, 539 F.3d 668, 677 (7th Cir. 2008) ("'[T]he skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job.

A claimant's [mental] condition may make performance of an unskilled job as difficult as an objectively more demanding job.'") (quoting SSR 85-15).

Finally, when concluding that the objective medical evidence did not support Plaintiff's claims of pain and impairment, the ALJ did not mention the potentially limiting effects of fibromyalgia, which, according to Dr. Newman's testimony, would not be objectively demonstrated by an x-ray or MRI. And although Dr. Case, Lakes's rheumatologist, did not complete an RFC report, the ALJ could have sought one in order to make a more full and fair record of his impairments. While Plaintiff bears the burden of proving his disability, "the ALJ in a Social Security hearing has a duty to develop a full and fair record." *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009); *see Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000) ("Failure to fulfill this obligation is good cause to remand for gathering of additional evidence."). Moreover, the ALJ did mention Dr. Case's October 2004 concern about possible malingering, but she did not expressly note that Dr. Case continued to treat Lakes for fibromyalgia long after that notation was made.

### 2. *Step 3 - Listing 12.05(C) and 12.04*

#### a. Listing 12.05(C)

Listing 12.05 provides that the following criteria must be established for a finding of mental retardation:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22. The

required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

. . . .

C.     A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function; Or

D.     A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

1.     Marked restriction of activities of daily living; or
2.     Marked difficulties in maintaining social functioning; or
3.     Marked difficulties in maintaining concentration, persistence, or pace; or
4.     Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

"[I]n order to meet all the requirements of Listing 12.05(C), a claimant must satisfy a three-part test: (1) the claimant must have a valid verbal, performance, or full scale IQ of 60 through 70, (2) the claimant must demonstrate physical or mental impairments imposing additional and significant work-related limitations of function, and (3) the claimant must meet the diagnostic description of mental retardation set out in the capsule." *Witt v. Barnhart*, 446 F. Supp. 2d 886, 893-94 (N.D. Ill. 2006).

Lakes argues that the ALJ improperly failed to indicate whether she considered Listing 12.05(C) despite his performance IQ of 70, in conjunction with the significant work-related limitations of back and shoulder pain, fibromyalgia,

and depression and/or anxiety.[4] *See Thomas v. Astrue*, No. 09 C 7851, 2011 WL 5052049, at *7 (N.D. Ill. Oct. 19, 2011) ("[I]n addition to [a] 70 IQ score, Plaintiff has presented evidence of severe physical impairments and an onset of mental illness prior to age 22, together which strongly suggests that he meets the requirements for Listing 12.05(C).").

The Commissioner responds that Dr. Snyder found only that Plaintiff's IQ was "borderline," which is a different diagnosis than "mental retardation," and thus the report demonstrates that Plaintiff did not meet the Listing. Furthermore, "Ms. Guini did not opine specifically that Plaintiff's IQ scores were 'valid' as required by 12.05C." (Def.'s Resp. at 5.) According to the Commissioner, the ALJ was not required to discuss Listing 12.05 "because the evidence does not suggest that Plaintiff's impairments satisfied the listing." (*Id.* at 5-6.)

First, "borderline" is a descriptive term for a 70 IQ and not necessarily dispositive of the issue whether Plaintiff suffers from mental retardation. *See Mendez v. Barnhart*, 439 F.3d 360, 361 (7th Cir. 2006) ("[A]n IQ of 70, which figures prominently in the criteria for disability based on mental retardation, is at the borderline between retardation and normal, if low, mental ability."). Second, the regulations direct an ALJ to "'include a discussion of whether or not obtained IQ

---

[4] Lakes argues, and the Commissioner does not dispute, that his significant subaverage general intellectual functioning must be assumed to have manifested during the developmental period. He completed school through the ninth grade; he has difficulties with reading, writing, and math; and there is no evidence of any injury that would have diminished his IQ after he turned twenty-two. *See Guzman v. Bowen*, 801 F.2d 273, 275 (7th Cir. 1986).

scores are considered valid and consistent with the individual's developmental history and degree of functional restriction.'" *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999) (upholding ALJ's finding of invalidity of IQ test where ALJ discussed reasons for the finding, including that claimant had not eaten for two days before the test; had been drinking until two in the morning the day of the test; was not diagnosed with mental retardation but rather borderline functioning; and another psychiatric evaluation found no evidence of mental retardation); *see Thomas*, 2011 WL 5052049, at *6 (noting the ALJ's detailed analysis of the IQ test in *Maggard*); *see also Tarbush v. Astrue*, No. 09 C 3400, 2010 WL 438155, at *3 (N.D. Ill. Feb. 2, 2010) (finding ALJ inadequately discussed validity of IQ tests where the court would be required to speculate as to why certain scores were disregarded).

The ALJ in this case noted that the test scores were not expressly described as valid by the examiner but did not engage in any independent analysis of their validity as required by the regulations. Moreover, to the extent that the ALJ needed to confirm the examiner's belief about the validity of the test, she could have asked for the information or requested that another test be given. *See Winfield v. Barnhart*, 269 F. Supp. 2d 995, 1007 (N.D. Ill. 2003) (finding ALJ's decision of invalidity of IQ tests was supported by substantial evidence where "[i]n order to create a full and fair record of the Claimant's cognitive functioning, the ALJ ordered multiple psychological evaluations and heard the testimony of expert witnesses").

Finally, the Commissioner's proffered reasons why Listing 12.05(C) was not met in this case were not given by the ALJ, who did not mention the listing at all.

*See Thomas*, 2011 WL 5052049, at *7 ("In any event, the issue is not whether Plaintiff meets the requirements of Listing 12.05C, but rather the ALJ's failure to discuss the listing in any meaningful way."). "'[I]n arguing that the ALJ was not required to discuss [a Listing] due to the insufficiency of the evidence, the Commissioner puts the cart before the horse. It is only after reviewing the evidence that the ALJ could have made an informed determination as to whether the Listing's requirements had been met.'" *Id.* at *7 (citation omitted); *see also Tarbush*, 2010 WL 438155, at *3 ("From the ALJ's decision, it is unclear whether he considered [the additional impairment requirement of Listing 12.05(C)] or chose not to perform the analysis because he had determined there was no valid IQ score between 60 and 70. In either case, analysis as to why the requirement is not met is lacking, amounting to error by the ALJ.").

The Commissioner's latter-day speculation as to the reason the ALJ did not discuss Listing 12.05(C) also violates the *Chenery* doctrine, "'which forbids an agency's lawyers to defend the agency's decision on grounds that the agency itself had not embraced.'" *Thomas*, 2011 WL 5052049, at *7 (quoting *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010)); *see SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943). "On appeal, the Commissioner may not generate a novel basis for the ALJ's determination. To permit meaningful review, the ALJ was obligated to explain sufficiently what she meant . . . ." *Kastner v. Astrue*, 697 F.3d 642, 648 (7th Cir. 2012); *see Hughes v. Astrue*, — F.3d —, No. 12-1873, 2013 WL 1634777, at *3 (7th

Cir. Jan. 16, 2013) (noting that the government's brief "[c]haracteristically, and sanctionably . . . violates the *Chenery* doctrine").

## b. Listing 12.04

Lakes also argues that the ALJ improperly considered the medical evidence in relation to her analysis of Listing 12.04, which governs affective disorders. Listing 12.04 provides that the required level of severity is met when the requirements of both the A and B criteria are met:

A.  Medically documented persistence, either continuous or intermittent of one of the following:

    1.  Depressive syndrome characterized by at least four of the following:

        a.  Anhedonia or pervasive loss of interest in almost all activities;
        b.  Appetite disturbance with change in weight;
        c.  Sleep disturbance;
        d.  Psychomotor agitation or retardation;
        e.  Decreased energy;
        f.  Feelings of guilt or worthlessness;
        g.  Difficulty thinking or concentrating;
        h.  Thoughts of suicide; and
        i.  Hallucinations, delusions, or paranoid thinking.

B.  Resulting in at least two of the following:

    1.  Marked restriction of activities of daily living;
    2.  Marked difficulties in maintaining social functioning;
    3.  Marked difficulties in maintaining concentration, persistence, or pace;
    4.  Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.

The ALJ agreed that the medical evidence was sufficient to satisfy the A criteria of the listing. (R. 43.) The ALJ further noted that the reports of Drs. Lee, Odeh, and Aniemeka, and Dr. Snyder supported a finding that the B criteria were also met. However, the ALJ rejected their conclusions, stating that the physicians lacked a significant treating relationship with Lakes when they gave their opinions, and they did not consider the possible impact of Lakes's substance abuse on their conclusions. The ALJ also rejected the opinion of Dr. Doshi, the treating psychiatrist, because a progress note showed that Lakes had been "stable" since his 2004 psychiatric admission. (R. 45.)

First, Lakes argues that Drs. Lee, Odeh, Aniemeka, and Snyder were not asked whether his history of drug and alcohol abuse was material to their conclusions, and the medical sources who gave an opinion on the issue concluded that his substance use was not material to the finding of disability. The ALJ thus created a backdoor method of denying Lakes's claim based on substance use without analyzing the effects of any substance use under the materiality standards required by the regulations. *See Smith v. Massanari*, No. 00 C 7652, 2002 WL 480955, at *8 (N.D. Ill. Mar. 25, 2002) (explaining that an ALJ must articulate his reasons for finding that drug use is material to a disability finding); *see also Kangail v. Barnhart*, 454 F.3d 627, 629 (7th Cir. 2006) ("[T]he fact that substance abuse aggravated [the claimant's] mental illness does not prove that the mental illness itself is not disabling.").

The Commissioner responds that the materiality analysis was not necessary due to the ALJ's finding that Lakes had achieved sobriety for an extended time since 2004. But the ALJ obviously considered Plaintiff's prior substance use to be material in relation to the medical reports issued in 2003. Otherwise, one is left to wonder why the ALJ faulted Lakes's treating physicians for failing to comment explicitly on the possible effect any substance use had on his functioning. The Court agrees with Plaintiff that the ALJ improperly discounted the 2003 reports on the basis of substance abuse without engaging in the materiality analysis.

Lakes also argues that the ALJ erred in concluding that Dr. Doshi's description of him as "stable" is not evidence that the B criteria are not satisfied. The Court agrees that "stable" does not necessarily mean that none of the criteria are satisfied, particularly where the psychiatrist is describing a patient who had been previously admitted to the hospital for psychiatric care. The ALJ's assumption that "stable" means that Lakes does not suffer from disabling impairments is also inconsistent with her statement that "Dr. Doshi . . . opined that claimant suffers from listing-level mental limitations." (R. 72.) The ALJ could have requested a mental RFC evaluation from Dr. Doshi, who was Plaintiff's longtime psychiatric treating physician and thus an important source by the ALJ's own definition.

### 3. *Treating Physician Rule*

Lakes contends that the ALJ's disregard of the opinions of his treating physicians in favor of the non-examining physician, Dr. Newman, was improper. A treating physician's opinion is to be given "controlling weight if it is 'well-supported'

26

and 'not inconsistent with the other substantial evidence' in the record. . . . An ALJ must offer 'good reasons' for discounting the opinion of a treating physician." *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011) (citations omitted). Furthermore, even if the decision included "sound reasons for refusing to give [the treater's] assessment controlling weight, the ALJ still would have been required to determine what value the assessment did merit." *Id.* (explaining that if a treating physician's opinion is not given controlling weight, the regulations require consideration of "the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion").

In weighing the various opinions in the record, the ALJ first noted correctly that any opinions purporting to make the ultimate conclusion that Lakes was disabled or unable to work should not be given controlling weight, as that is an ultimate issue to be decided by the Commissioner. The ALJ also stated that opinions about Lakes's emotional limitations that were given by his treating internists were given less weight, and she also gave little weight to any opinions offered after only one or two treatment visits. (R. 71.)

The ALJ stated that she gives the greatest weight to the opinions of specialists in their area of expertise, rendered after significant treatment relationship with the claimant, and which are consistent with and supported by contemporaneous progress notes and diagnostic studies. (R. 72.) She noted that few

of the many opinions in the record satisfied those criteria.[5] Dr. Case is a rheumatologist with a lengthy treatment relationship with Lakes, but he declined to prepare an RFC report. Dr. Husain has a lengthy treatment relationship with Lakes, but she has often referred him to specialists for treatment outside her areas of expertise, and her contemporaneous progress notes do not support the extreme limitations listed in her November 2008 report. In addition, the opinions of Lakes's other treating sources were based upon only brief periods of treatment. (R. 71.) The ALJ thus concluded that she gave the greatest weight to Dr. Newman's opinion because he had access to all of Lakes's medical records. (R. 72.)

First, the ALJ's statement that Dr. Newman's opinion would be preferred because he had access to all of Plaintiff's records "is so general as to be unreviewable by this Court and does not alone support a preference for [the examiner's] opinions over those of Plaintiff's treating [physicians]." *Tarbush*, 2010 WL 438155, at *4.

Second, Dr. Newman expressly admitted that he did not consider the impact of fibromyalgia or psychiatric impairments in forming an opinion about Lakes's limitations. But the ALJ failed to seek additional information on those conditions

---

[5]  The ALJ also stated that Lakes did not accurately disclose his history of alcohol and drug use to some of his doctors, and those who were aware of his current substance use "did not discuss the likely effect of sustained sobriety on claimant's mental RFC when they prepared physical or mental RFC opinions prior to the first decision." (R. 71.) This issue was discussed *supra*.

from Drs. Case or Doshi, who were Plaintiff's long-term treating physicians and were specialists in their area of expertise.

## **CONCLUSION**

For the foregoing reasons, Lakes's motion for summary judgment [Doc. No. 14] is granted in part and denied in part. The Court finds that this matter should be remanded to the Commissioner for further proceedings consistent with this opinion.

**SO ORDERED.**                                                   **ENTERED:**

**DATE:**    **February 19, 2012**    _____
                                                                      **HON. MARIA VALDEZ**
                                                                      **United States Magistrate Judge**